# EXHIBIT A

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Siren Retail Corporation d/b/a Starbucks Reserve Roastery *and* Workers United, affiliated with Service Employees International Union.** Case 02–CA–305984

November 27, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On December 6, 2023, Administrative Law Judge Michael P. Silverstein issued the attached decision, and on January 2, 2024, he issued an errata. The Respondent filed exceptions and a supporting brief, and the General Counsel filed an answering brief. In addition, the General Counsel filed limited exceptions and a supporting brief, the Respondent filed an answering brief, and the General Counsel filed a reply brief. The Charging Party also filed cross-exceptions and a supporting brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.[1]

The Board has considered the decision and the record in light of the exceptions and the briefs and has decided to affirm the judge's rulings, findings,[2] and conclusions only to the extent consistent with this Decision and Order.[3]

This case concerns the Respondent's dress code at its Starbucks Reserve Roastery in New York City. For the reasons stated by the judge, we adopt his findings that the Respondent violated Section 8(a)(1) of the Act by maintaining a policy that prohibits employees from wearing pins or buttons that advocate for a political, religious, or personal issue,[4] and by maintaining and enforcing a policy that prohibits employees from wearing shirts or tops that have logos, writings, or designs.[5] We also adopt the judge's findings that the Respondent violated Section 8(a)(1) by instructing several employees to remove their union T-shirts and by threatening one employee with discipline if she did not remove her union T-shirt.[6]

However, for the reasons stated below, we reverse the judge's dismissal of the allegation that the Respondent's policy prohibiting employees from wearing more than one union button or pin violated Section 8(a)(1). The judge found that the General Counsel was "collaterally estopped" from challenging the single-pin policy by a 2012 Second Circuit decision permitting such a ban at several Starbucks neighborhood stores. We find that collateral estoppel ("issue preclusion" in modern parlance) does not apply and that the single-pin policy violated the Act.

FACTS

As set forth more fully in the judge's decision, the four-floor, 23,000-square-foot Starbucks Roastery at 61 9th Avenue in Manhattan is one of only three such Roasteries in the United States and is quite distinct from the 13,000 neighborhood stores. Starbucks intends the Roastery to provide an immersive experience in the "Willy Wonka"-like world of making coffee. The "vibe" is intended to be "steampunk"[7] and "hipster chic." There is a coffee roasting operation on site, several bars, and a retail section that sells a variety of Starbucks and Roastery-branded clothing and other merchandise. The average customer spends 45

---

[1] The Respondent asserts that Members Prouty and Wilcox should recuse themselves, claiming that there is a "conflict of interest arising from their past, present, and perceived relationships with the Service Employees International Union." Members Prouty and Wilcox have determined, in consultation with the NLRB Designated Agency Ethics Official, that there is no basis to recuse themselves from the adjudication of this case.

[2] The Respondent has implicitly excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951).

[3] We have amended the judge's conclusions of law consistent with our findings herein. We shall modify the judge's recommended Order to require the Respondent to rescind the dress code rule at its New York City Roastery prohibiting employees from wearing more than one union pin or button, to conform to our findings herein and to the Board's standard remedial language, and in accordance with our decision in *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022). We shall also substitute a new notice to conform to the Order as modified.

[4] The Respondent excepted to the judge's finding that this policy was unlawful, but it does not state, either in its exceptions or in its supporting brief, any grounds on which this purportedly erroneous finding should

be reversed. Therefore, in accordance with Sec. 102.46(a)(1)(ii) of the Board's Rules and Regulations, we shall disregard this exception. See *Holsum de Puerto Rico, Inc.,* 344 NLRB 694, 694 fn. 1 (2005), enfd. 456 F.3d 265 (1st Cir. 2006). Moreover, even if the Respondent had filed properly supported exceptions, we would adopt the judge's finding for the reasons stated in his decision.

[5] In adopting the judge's finding that the Respondent's "no logos or writings" policy violated Sec. 8(a)(1), we note that the judge inadvertently merged his treatment of this issue into his discussion of the larger issue of whether the Respondent violated Sec. 8(a)(1) in forcing employees to remove their union T-shirts. Although the judge referred to the "no logos or writings" policy in his conclusions of law, he inadvertently omitted any specific mention of the policy in the Order and notice. We have modified the Order and notice to correct this error.

[6] The Respondent filed bare exceptions to the judge's finding of an unlawful threat which we shall disregard in accordance with Sec. 102.46(a)(1)(ii) of the Board's Rules and Regulations. See *Holsum de Puerto Rico, Inc.*, supra. Furthermore, even if the Respondent had filed properly supported exceptions, we would adopt the judge's finding for the reasons stated in his decision.

[7] "Steampunk" is defined in Merriam-Webster's dictionary as "science fiction dealing with 19th-century societies dominated by historical or imagined steam-powered technology." See https://www.merriam-webster.com/dictionary/steampunk (last visited November 5, 2024).

2                                DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

minutes at the Roastery, compared with just 3 ½ minutes at a neighborhood store.

The Roastery's design team consulted on the dress code to ensure that it aligns with the Roastery's overall aesthetic. The specifics of the dress code are as follows: Partners[8] are to wear dark blue or black jeans with cuffs rolled up. Tops are a button-down shirt with a collar or a turtleneck. The tops must be solid colored or a "small, simple pattern or print," in a color palette of "muted color tones of red, orange, yellow, green, blue, brown, purple, black, brown and white," and can be worn tucked or untucked.[9] They "may have a small manufacturer's logo, but may have no other designs, logos or writings."

Additional tops that may be worn, which are exceptions to the color palette and "no logo" rules, are "Siren Roastery Merch Shirts, Sweatshirts or Partner Network shirts" on top of the collared shirt or turtleneck. There are 10 to 12 partner networks that are designed to create community within the company. For instance, there are networks for partners "who identify as Hispanic, Veterans . . . , African-American, and Pan-Asian." The partner network shirts are usually black or dark green—but occasionally blue or brown. They have a small logo on the upper left front for the particular network, and a small message on the back such as "Hora del Café" (Coffee Time) for the Hispanic partner network. The designs for the partner network shirts change every year.

Regardless of the top worn, permitted accessories include "Fun dress socks, handkerchiefs, ties, bowties. Approved Hat [flat, fedora, panama, trilby, beret] in Black, White, Gray, Brown, Khaki, or Beige." Finally, partners wear brownish-green Starbucks aprons over their other clothing.

As to buttons and pins, the Respondent's policy provides that:

> Partners may only wear buttons or pins issued to the partner by Starbucks for special recognition or for advertising a Starbucks-sponsored event or promotion; Starbucks approved pins representing a partner network and one reasonably sized and placed button or pin that identifies a particular labor organization or a partner's support for that organization, except if it interferes with safety or threatens to harm customer relations or otherwise unreasonably interferes with Starbucks [sic] public image . . . .

BLM pins are allowed by Starbucks.

> Partners are not permitted to wear buttons or pins that advocate a political, religious or personal issue . . . .

The complaint alleges, in relevant part, that the Respondent violated Section 8(a)(1) by maintaining the single-pin policy at its New York City Roastery. The judge dismissed the allegation, finding that the General Counsel was "collaterally estopped" from challenging the policy by litigation that culminated in a 2012 Second Circuit decision. See *NLRB v. Starbucks Corp.*, 679 F.3d 70 (2d Cir. 2012).

In 2006, Starbucks entered into an informal settlement with the Board to resolve allegations stemming from a charge filed by the Industrial Workers of the World (IWW), which alleged that Starbucks refused to allow employees to wear union pins and buttons at several New York City neighborhood stores that the Union was attempting to organize. *Starbucks Coffee Co.*, 354 NLRB 876 (2009), affirmed and incorporated by reference 355 NLRB 636 (2010). The agreement resulted in Starbucks adopting a policy that allowed Starbucks-sponsored pins and "reasonably-sized and placed buttons or pins that identify a particular labor organization or a partner's support for that organization . . . ." Starbucks interpreted its obligation under this provision as limited to allowing a partner to wear a single union pin or button.

The IWW challenged this single-pin policy. The judge found that the policy was unlawful because Starbucks had failed to show special circumstances justifying this limitation on employees' general right to wear union insignia at work. See *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-803 & fn. 7 (1945) (setting forth this right and the special circumstances exception). The Board adopted the judge's finding. See *Starbucks Coffee Co.*, supra.

On review, the Second Circuit denied enforcement and found the single-pin policy to be lawful. *NLRB v. Starbucks Corp.*, 679 F.3d at 78. The court held that "[t]he company adequately maintains the opportunity to display prounion sentiment by permitting one, but only one, union button on workplace clothing." Id. In its view, Starbucks met its burden of establishing that the policy was a "necessary and appropriate" means of maintaining its public image. Id.

As noted, in this case, the judge found that under the doctrine of "collateral estoppel" (issue preclusion), the Second Circuit's decision barred the General Counsel from challenging the single-pin policy maintained by the Respondent at its New York City Roastery. In the judge's view, "[t]he one-pin rule at issue before me is nearly

---

[8] The Roastery, like the rest of Starbucks, refers to its employees as "partners."

[9] In some parts of the record, the acceptable color palette listed is more limited. This appears to be because the palette was expanded at some point. The Respondent does not except to the judge's finding regarding the contents of the color palette, nor does it dispute the judge's description of the palette in its brief.

identical to the one-pin rule decided by the Second Circuit . . . . " The judge stated that:

> Since it is the same prosecuting and responding parties litigating nearly identical facts already litigated before and determined by the Second Circuit, collateral estoppel principles compel the conclusion that the General Counsel is foreclosed from seeking reconsideration of the one-pin rule and must be bound by the Second Circuit's determination.

The General Counsel and the Union except, arguing that issue preclusion does not apply because this case does not involve the "same issue" as the earlier litigation involving neighborhood stores. For the reasons set forth below, we agree with the General Counsel and the Union that this case does not involve the "same issue," and therefore we reverse the judge's finding of issue preclusion.[10]

## ANALYSIS

### A. Issue Preclusion

Under the doctrine of collateral estoppel, now generally referred to as "issue preclusion," "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, the determination is conclusive in a subsequent action between the parties . . . . " Restatement (Second) of Judgments § 27 (1977); see generally *Montana v. United States*, 440 U.S. 147, 153 (1979); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 fn. 5 (1979). Issue preclusion is properly applied in a proceeding involving a governmental entity such as the Board "where the government is litigating the same issue arising under virtually identical facts against the same party" in a subsequent proceeding. *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 173 (1984).[11]

The General Counsel excepts to the judge's application of issue preclusion on the grounds that the "same issue" is not at play. She argues that the determination of whether "special circumstances" justifying a one-pin limitation exist depends critically on both the overall contents of the dress code and the overall context of the workplace. She argues that the overall dress codes involved in the two cases differ significantly. At the neighborhood Starbucks involved in the earlier case, employees were required to wear black or khaki bottoms and black or white tops. At the Roastery, in contrast, employees could wear shirts not only of black, white, grey, navy, and brown, but "muted

colors" of blue, green, red, orange, yellow, or purple. In a similar vein, the ambience of the multilevel, 23,000-square-foot Roastery with its many "distinctive design elements" contrasts significantly with that of a basic neighborhood store. The General Counsel asserts that these significant differences between the Roastery and the stores involved in the previous case render the application of issue preclusion inappropriate.

The Charging Party, for its part, places strong reliance on *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 599–600 (1948), for the principle that issue preclusion applies only where the issue raised in the second proceeding is "identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." Most pointedly, the Union notes that the Respondent itself characterized the Roastery as "one of the most magnificent, unique coffee houses in the country," offering "an immersive sensory coffee experience *fundamentally distinct from the standard Starbucks store.*" (emphasis added).

We agree with the General Counsel and Charging Party that this case does not involve the "same issue" as the earlier litigation involving the neighborhood stores. The "same issue" requirement is met only where the facts in the two proceedings are "virtually identical." See *Stauffer Chemical*, supra at 173. As evident from the judge's decision, the facts in this case differ significantly from those in the 2012 decision that the judge found preclusive. The earlier case involved neighborhood Starbucks stores where the employees were restricted to wearing black or white tops and black, white, or khaki bottoms in order to present a "clean, neat, and professional appearance." *Starbucks*, 679 F.3d at 72. Here, by contrast, employees may wear shirts with a simple pattern or print as well as solid colors "with an expanded color palette that includes orange, purple, red, yellow, brown, and khaki." They may also wear Siren Retail "merch" and "partner network" T-shirts in a dozen varieties; flat, fedora, Panama, and Trilby hats in six approved colors; and accessories such as "fun socks," handkerchiefs, ties, and bowties. The whole point is to be "hip and trendy" and present a "steampunk, hipster" vibe. The issue of whether Starbucks had proven special circumstances to justify its one-pin limitation in the neighborhood stores is clearly not the "same issue" as whether the Respondent can show special circumstances

---

[10] In making the issue-preclusion finding, the judge relied on a Court of Appeals decision that reversed the Board. The Board has a policy of nonacquiesence in adverse circuit court decisions. See *Sunbelt Rentals, Inc.*, 372 NLRB No. 24, slip op. 17 fn. 40 (2022); *D.L. Baker, Inc.*, 351 NLRB 515, 529 fn. 42 (2007). Despite the nonacquiesence policy, we analyze this case under issue-preclusion principles because the judge and the parties treat the question here as one of issue preclusion, and because

it is so clear that the 2012 Second Circuit case and this case do not involve the "same issue."

[11] The judge did not discuss the question of whether the Union, which was not a party to the prior litigation, was also precluded from raising the issue. Given our finding that the case before us does not involve the "same issue" as in the earlier litigation, it is unnecessary for us to consider this question.

4                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

in the New York City Roastery. Therefore, we reverse the judge's finding that issue preclusion applies to the single-pin policy.[12]

Because the judge found that issue preclusion barred the General Counsel from arguing that the one-pin policy was an unlawful restriction on Section 7 rights, he did not specifically address the question of whether special circumstances justified the one-pin policy. Having reversed the judge's finding that issue preclusion applies, we next consider this question.

### B. The Single-Pin Policy

Under *Republic Aviation Corp. v. NLRB*, 324 U.S. at 801-803 & fn. 7, limitations on employees' ability to wear union insignia in the workplace violate Section 8(a)(1) unless the employer proves that special circumstances justify the limitation. One means of establishing special circumstances is to show that the display of the insignia at issue would unreasonably interfere with a public image that the employer has established through appearance rules or a dress code. See *Boch Honda*, 362 NLRB 706, 707 (2015), enfd. sub nom. *Boch Imports, Inc. v. NLRB*, 826 F.3d 558 (1st Cir. 2016). To overcome the general right to wear union insignia, the employer must not only demonstrate special circumstances, but also that the limitation is narrowly tailored to the circumstances that justify the maintenance of its policy. Id. "To establish that protected insignia interfere with an employer's public image, the employer must demonstrate a carefully cultivated public image that is so consistently preserved that the nonconforming symbol, button, or other insignia would jeopardize the image." *Home Depot, USA*, 373 NLRB No. 25, slip op. at 11 (2024) (citing cases). The Board considers the appearance and message of the insignia to determine if it interferes with the employer's desired public image. *Grill Concepts Services*, 364 NLRB 385, 386–387 (2016). The requirement that employees wear a uniform is not alone a special circumstance. *P.S.K. Supermarkets*, 349 NLRB 34, 34–35 (2007).

Although the Respondent does not directly address the substance of the one-pin policy in its answering brief, its arguments there concerning issue preclusion as well as its arguments in its exceptions brief regarding the ban on union T-shirts speak to this issue, and make clear that its position is that the one-pin policy and dress code restrictions are justified because they are necessary to the maintenance of the Roastery's public image. In support of its position, the Respondent relies chiefly on *W San Diego*, 348 NLRB 372 (2006).[13]

In *W San Diego*, the respondent hotel promoted a "Wonderland" experience where guests could fulfill their "fantasies and desires" and get "whatever [they] want whenever [they] want it." Id. at 372. In furtherance of this Wonderland experience and a hip, chic, and trendy look, employees were required to wear a professionally designed all-black uniform, including a black T-shirt, black pants, and a black apron. Id. at 372–373. The uniform had a half-inch silver "W" pin on the upper left chest. Id. at 372. All other adornments were prohibited. Id. At the W San Diego, employees were encouraged to "express themselves" and "interact with guests on a personal level." Id.

The Board held that in furtherance of the image the hotel sought to project, it acted lawfully in prohibiting employees from wearing 2-inch square buttons – four times the size of the "W" pins—with "JUSTICE NOW! JUSTICIA AHORA! H.E.R.E. LOCAL 30" written in blue or red letters on a yellow background. Id. at 373. Consistent with the requirement that any prohibitions on union insignia be narrowly tailored as well as based on special circumstances, the Board held that the ban was lawful in public areas but not in nonpublic areas. Id. at 373–374.

As the General Counsel points out, however, the Board has made clear that *W San Diego* rested on "narrow factual circumstances." See *Boch Honda*, supra at 707 fn. 6. She argues that the Respondent cannot demonstrate special circumstances where "[b]y design, the dress code here allows for broad variations in clothing and a large number of varied buttons and pins with the aim of projecting a 'hipster' and 'trendy' brand identity."

---

[12] The judge discussed the case of *Sabine Towing & Transportation Co.* at length. We find this case readily distinguishable. In *Sabine I*, the Fifth Circuit, reversing the Board, held that the employer acted lawfully in prohibiting nonemployee organizers from boarding its docked vessels to solicit its employees regarding the upcoming election. 599 F.2d 663 (5th Cir. 1979), denying enf. to 205 NLRB 423 (1973). In *Sabine II*, 263 NLRB 114 (1982), organizers from the same union again sought access to the employer's docked vessels, this time to communicate with employees regarding a rerun election. The employer again denied access, and the union filed new charges. The Board dismissed the new allegations on the ground that the General Counsel and the Union were collaterally estopped from relitigating the access issue, finding that there had been no material change in the factual circumstances.

[13] In its exceptions brief, the Respondent also relies on *World Color (USA) Corp.*, 369 NLRB No. 104 (2020), for the proposition that its dress code, including the one-pin policy, is lawful because it allows employees to wear that one pin and thereby express their union sentiment. We adopt the judge's rejection of this argument for the reasons he states. *Tesla, Inc.*, 371 NLRB No. 131, slip op. at 10 (2022), enf. denied 86 F.4th 640 (5th Cir. 2023).

Here, unlike *Sabine*, there have been material changes in the factual circumstances: from standard neighborhood stores to a "Willy Wonka"-like Roastery, and from employees who wear solely black, white, and khaki to employees who may wear a wide variety of colors and patterns, Starbucks "merch," partner network shirts in a dozen varieties, and flat, fedora, Panama, and Trilby hats.

SIREN RETAIL CORPORATION D/B/A STARBUCKS RESERVE ROASTERY 5

We agree with the General Counsel that the Respondent has not proven special circumstances justifying the one-pin policy here.[14] Specifically, the Respondent presented no evidence on how employees wearing more than one union pin would interfere with the Respondent's public image. In this case, unlike *W San Diego*, the employees did not wear one standard uniform. Nor was the color palette by any means limited to black; permitted colors included not only brown and white in addition to black, but "muted colors" of blue, green, yellow, red, orange, and purple. Added to the employees' permitted "look" was Starbucks Roastery wear (including beanies) and cultural identity shirts of 10 to 12 varieties in multiple colors. Adornments were far from prohibited: employees could wear "fun socks," bow ties, fedoras, and berets. Thus, there was no single "look" that would be marred if some employees chose to add another union pin. See *Home Depot, USA*, supra at 11 (finding that when employer did not require employees to wear standardized aprons but instead encouraged employees to personalize them with designs including LGBTQ Pride symbols, Pan-African flag colors, holiday symbols, and sports insignia, its uniform public image defense failed). Moreover, the Respondent permitted employees to wear as many Starbucks and Starbucks' partner network pins[15] as they liked as well as Black Lives Matter pins. Both the variety and number of pins belies any argument by the Respondent that additional union pins would conflict with its "steampunk" atmosphere or public image. See *In-N-Out Burger, Inc.*, 365 NLRB 471, 471 fn. 2, 478, 481 (2017) (finding that employer's appearance code and customer experience argument did not prove special circumstances justifying prohibiting employees from wearing unauthorized buttons and instructing an employee to remove his "Fight For $15" button when employer required employees to wear seasonal Christmas buttons and a button seeking donations to a nonprofit focused on preventing child abuse), enfd. 894 F.3d 707 (5th Cir. 2018); *AT&T*, 362 NLRB 885, 888 (2015) (finding no public-image special circumstances justifying prohibition on union buttons and stickers when employees were permitted to wear a variety of other similarly sized buttons and stickers); *Meijer, Inc.*, 318 NLRB 50, 51 (1995) (finding no special circumstances when employer prohibited union pins but allowed holiday and photo pins), enfd. 130 F.3d 1209 (6th Cir. 1997); *Holladay Park Hospital*, 262 NLRB 278, 279 (1982) (finding no special circumstances when employer prohibited wearing

yellow ribbons to support the union's position in bargaining negotiations but permitted other types of union insignia and permitted wearing ribbons in support of other causes). We therefore find that the Respondent did not show special circumstances that would justify the one-union-pin limitation.

Accordingly, we find that the Respondent violated Section 8(a)(1) by maintaining a dress code policy that prohibits employees from wearing more than one union pin or button at its New York City Roastery.

AMENDED CONCLUSIONS OF LAW

1. The Respondent, Siren Retail Corp. d/b/a Starbucks Reserve Roastery, is an employer within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Charging Party, Workers United, Affiliated with Service Employees International Union, is a labor organization within the meaning of Section 2(5) of the Act.

3. By engaging in the following conduct, the Respondent has violated Section 8(a)(1) of the Act:

a. Maintaining a dress code policy that prohibits employees from wearing more than one union pin or button.

b. Maintaining a dress code policy that prohibits employees from wearing pins or buttons that advocate for a political, religious, or personal issue.

c. Maintaining and enforcing a dress code policy that prohibits employees from wearing shirts or tops that have logos, writings, or designs.

d. Ordering employees to remove their union T-shirts.

e. Threatening employees that they will be disciplined if they refuse to remove their union T-shirts.

ORDER

The National Labor Relations Board orders that the Respondent, Siren Retail Corporation d/b/a Starbucks Reserve Roastery, New York, New York, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining an overly broad policy that prohibits employees from wearing more than one union pin or button.

(b) Maintaining an overly broad policy that prohibits employees from wearing pins or buttons that advocate for a political, religious, or personal issue.

(c) Maintaining and enforcing an overly broad policy that prohibits employees from wearing shirts or tops that have logos, writings, or designs.

(d) Ordering employees to remove their union T-shirts.

---

[14] Further, we note that the Respondent did not even attempt to prove that its limitation was narrowly tailored to the special circumstances that it argued justified the limitation.

[15] As the judge found and as noted above, employees were permitted to wear t-shirts, pins and buttons that promote the 10-12 Starbucks-

partner networks for partners who identify as, for example, Hispanic, veterans (or serving in the armed forces), Pan-Asian, and Black or African-American.

(e)  Threatening employees that they will be disciplined if they do not remove their union T-shirts.

(f)  In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed by Section 7 of the Act.

2.  Take the following affirmative action necessary to effectuate the policies of the Act.

(a)  Rescind the rule that prohibits employees from wearing more than one union pin or button.

(b)  Rescind the rule that prohibits employees from wearing pins or buttons that advocate for a political, religious, or personal issue.

(c)  Rescind the rule that prohibits employees from wearing shirts or tops that have logos, writings, or designs.

(d)  Furnish employees with inserts for the current dress code that (1) advise that the unlawful provisions have been rescinded, or (2) provide lawfully worded provisions on adhesive backing that will cover the unlawful provisions; or publish and distribute to employees revised dress codes that (1) do not contain the unlawful provisions, or (2) provide lawfully worded provisions.

(e)  Post at its New York City Roastery facility copies of the attached notice marked "Appendix."[16]  Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material.  If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 19, 2022.

(f)  Within 21 days after service by the Region, file with the Regional Director for Region 2 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  November 27, 2024

_____
Lauren McFerran,                 Chairman

_____
David M. Prouty,                  Member

_____
Gwynne A. Wilcox,               Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain an overly broad policy that prevents our employees from wearing more than one union pin or button.

---

[16] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region.  If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facilities reopen and a substantial complement of employees have returned to work.  If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region.  If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]."

If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted and Mailed by Order of the National Labor Relations Board" shall read "Posted and Mailed Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

SIREN RETAIL CORPORATION D/B/A STARBUCKS RESERVE ROASTERY

7

WE WILL NOT maintain an overly broad policy that prohibits our employees from wearing pins and buttons that advocate for political, religious, or personal issues.

WE WILL NOT maintain or enforce an overly broad policy that prohibits our employees from wearing shirts or tops that have logos, writings, or designs.

WE WILL NOT order you to remove your union T-shirts.

WE WILL NOT threaten you with discipline for wearing your union T-shirts.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the unlawful dress code rule that prohibits our employees from wearing more than one union pin or button.

WE WILL rescind the unlawful dress code rule that prohibits our employees from wearing pins or buttons that advocate for a political, religious, or personal issue.

WE WILL rescind the unlawful dress code rule that prohibits our employees from wearing shirts or tops that have logos, writings, or designs.

WE WILL furnish you with inserts for the current employee dress code policy that (1) advises that the unlawful provisions have been rescinded, or (2) provides lawfully worded provisions on adhesive backing that will cover the unlawful provisions; or WE WILL publish and distribute revised employee dress codes that (1) do not contain the unlawful provisions, or (2) provide lawfully worded provisions.

SIREN RETAIL CORP. D/B/A STARBUCKS RESERVE ROASTERY

The Board's decision can be found at https://www.nlrb.gov/case/02-CA-305984 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Susannah Ringel, Esq.* and *Jacob Frisch, Esq.,* for the General Counsel.
*David Strock, Esq., Jim Thelen, Esq,* and *David Ostern, Esq.,* for the Respondent.
*Sommer Omar, Esq.*, for the Charging Party.

DECISION

STATEMENT OF THE CASE

MICHAEL P. SILVERSTEIN, Administrative Law Judge. In this case, the General Counsel alleges that Siren Retail Corporation d/b/a Starbucks Reserve Roastery (Respondent) has maintained certain unlawful dress code rules at its New York City Roastery location. The allegedly unlawful dress code rules at issue include: 1) allowing employees to only wear one pin or button in support of a labor organization ("the one-pin rule"); 2) prohibiting employees from wearing buttons or pins that advocate a political, religious, or personal issue; and 3) prohibiting employees from wearing shirts, tops, or outerwear that contain designs, logos and writings aside from a small manufacturers' logo. The General Counsel further alleges that on about September 19, 2022, Respondent violated the Act by instructing five employees to remove union T-shirts that they were wearing and threatening these employees with discipline if they did not change out of their union T-shirts.

For the reasons described below, I recommend dismissal of the one-pin rule allegation on collateral estoppel grounds, but I find that Respondent has violated the Act as alleged concerning the two remaining dress code rules, instructing employees to remove their union T-shirts, as well as the threat of discipline for failing to change out of the union T-shirts.

The Charging Party filed the charge in this case on October 25, 2022. The original complaint issued on June 22, 2023, and an amended complaint issued on August 23, 2023. Respondent filed its answer to the original complaint on July 6, 2023, and filed its answer to the amended complaint on September 6, 2023. On September 6, 2023, counsel for the General Counsel issued to all parties a Notice of Intent to Amend Complaint at Hearing, and formally moved to amend the complaint during the hearing. (GC 2a and 2b.)[1] I granted this motion over Respondent's objection.

This case was tried in New York, New York, on September 19 and 20, 2023, and concluded virtually on September 26, 2023, using the Zoom for Government platform. At trial, all parties were afforded the right to call, examine, and cross-examine witnesses,[2] to present any relevant documentary evidence, and to argue their respective legal positions orally. Counsel for the General Counsel and Respondent filed posthearing briefs.

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel and Respondent, I make the following:

---

[1] The amendment expanded Par. 7 to add the unlawful threat allegation now contained in Par.7(b) of the complaint. See GC Exh. 2.

[2] The General Counsel called two witnesses—Laura Garza and Ashley Kido—while the Respondent called three witnesses—Alex Sariyan, Eryn Sable, and Carlos Carrasco Rivera.

8                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

FINDINGS OF FACT

JURISDICTION

Respondent admits, and I find, that it is a Washington corporation with a facility located at 61 Ninth Avenue, New York, New York. In conducting its business operations over the last 12 months, Respondent derived gross revenues in excess of $500,000 and purchased and received goods in the State of New York valued in excess of $5000 from points located outside the State of New York. Respondent also admits, and I find, that Respondent is an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

Based on the foregoing, I find that this dispute affects commerce and that the National Labor Relations Board (the Board) has jurisdiction over this case pursuant to Section 10(a) of the Act.

ALLEGED UNFAIR LABOR PRACTICES[3]

The facility involved in this case is the Starbucks Reserve Roastery in New York City (the NYC Roastery). While there are 13,000 "neighborhood" Starbucks stores across the United States, there are only 3 Roasteries in the United States (New York, Chicago, and Seattle) and 3 more across the globe (Tokyo, Shanghai, and Milan). (Tr. 186, 215.) The NYC Roastery, which opened in December 2018, is a multi-story, 23,000 square-foot immersive experience designed to create the "Willy Wonka" of coffee. (Joint 1, §3; Respondent 7, Tr. 259.) To this end, there is a coffee roasting operation onsite, with an enormous copper cask serving as the centerpiece. There is the "main bar" for the ordering and consumption of traditional coffee beverages and the "experience bar," where coffee beverages are crafted through a variety of techniques not found in the "neighborhood" stores. There is also a separate bar upstairs, called "Arriviamo," which fuses coffee with alcoholic beverages. Additionally, there is an onsite bakery called "Princi," that features store-baked breads, artisan pizzas, and pastries, as well as a retail section that sells Starbucks-branded apparel and merchandise.[4]

Carlos Carrasco Rivera was part of the design team that created the NYC Roastery. (Tr. 250.) He testified that it took about 2 to 3 years from initial concept design to opening the NYC Roastery. (Tr. 269.)[5] And Eryn Sable, who was a regional operations coach for Siren Retail in September 2022 and currently serves as Siren Retail's director of operations for the Seattle

market, testified that the purpose of the Roasteries is to let the customers be part of the magic of coffee—to inundate all of the customer's senses with coffee. (Tr. 187, 244.) Every piece of the Roastery's design seeks to further this purpose—from the woods used in the main bar to the lighting and design of the ceiling meant to evoke Times Square. (Tr. 244.)[6] The NYC Roastery features a clacker (Solari) board reminiscent of a New York train station and a movable art wall consisting of coffee cards that can be arranged in various shapes like a Christmas tree or spelling out "NYC." (Tr. 266.) There is also a custom designed 3000-pound copper sculpture of the Starbucks Siren to complement the massive copper roasting cask. (Tr. 263, 272.)

Sable asserts that the NYC Roastery's partners[7] are brand ambassadors for the Roastery -there to help support the vision and experience the customer will have. Partners serving as concierges (greeters stationed by the main entrance of the Roastery) help welcome customers into the Roastery. The concierges educate customers as to where they can go and what experiences are available. The NYC Roastery also employs a flotilla of baristas at both the main and experience bars. These baristas prepare coffee beverages, demonstrate coffee making techniques unique to the Roastery, walk customers through a coffee tasting, and answer questions about the coffee served in the Roastery. (Tr. 191.)

Sable opined that NYC Roastery partners are part of the cast of characters that deliver this coffee experience, and Respondent wants its partners onstage, but it does not want its partners in the spotlight. (Tr. 209.) In this regard, Carrasco-Rivera's design team consulted on the Roastery partner dress code to ensure that it aligns with the overall design aesthetic.[8] Sable described this look as steampunk, hipster chic. (Tr. 192, 275.) It features cuffs, dark jeans, a muted color palette, button down shirts, and collars. Complementing this look is the apron that all baristas and operations leads wear. The brownish, green leather aprons are custom-made for the Roastery and feature rivets, stitching, and leather straps meant to channel Respondent's steampunk, hipster vibe. According to Carrasco-Rivera, the apron design is an integral part of the Roastery experience as the textile used in the apron reminds the customer that they are in a roasting facility and the color of the apron changes over time to mirror the green to brown transformation of the coffee bean. (Tr. 189, 260–261.)

*NYC Roastery Dress Code*

Alex Sariyan, the NYC Roastery's operations manager in

---

[3] The record is hereby corrected as follows at: page 23, line 24, "directive" is replaced by "directed"; at page 34, line 10 "Mr." is replaced by "Ms."; at page 35, line 4, "Mr. Frisch" is replaced by "Ms. Omar"; at page 38, line 23, "backup house area" is replaced by "back of house area"; at page 48, line 24, "roast street" is replaced by "roastery"; at page 59, line 1, "prerogative" is replaced by "probative"; at page 94, line 2, "Guests" is replaced by "Guess"; at page 143, lines 13 and 14, "registry" is replaced by "roastery"; at page 187, line 2, "ever" replaced by "every"; at page 187, line 22, "in" is replaced by "is"; at page 221, line 3, "Marcy's" is replaced by "Macy's"; at page 255, line 24, "walk" is replaced by "work"; at page 261, lines 12 and 13, "cast" is replaced by "cask"; at page 277, line 20, "Children" is replaced by "Chicago."

[4] In addition to the three Roasteries, there are three Starbucks Reserve stores in the United States—2 in Manhattan (Greenwich Lane and the Empire State Building) and 1 in Seattle (SODO). The Reserve stores emulate the Roasteries in their design and amenities (e.g. serving

alcohol), but none contains a roasting plant. (Tr. 231–237.) Additionally, there was testimony that the name "Siren Retail" collectively refers to the three US Roasteries and the three Reserve stores. (Tr. 237.) But since the instant amended complaint specifically identifies the Respondent as "Starbucks Reserve Roastery" and the commerce pleading language in paragraph 2 of the amended complaint referred specifically to the NYC Roastery, my decision, analysis, and recommended remedy only applies to the NYC Roastery and not to the Starbucks Reserve stores.

[5] Eryn Sable testified that the capital investment for a Roastery is about 30 times the cost of a "neighborhood" Starbucks store. (Tr. 243.)

[6] Customers spend an average of 45 minutes in the NYC Roastery whereas on average, a customer spends 3½ minutes in a neighborhood Starbucks. (Tr. 244.)

[7] Starbucks refers to its employees as "partners."

[8] Carrasco-Rivera's design team also consulted on the NYC Roastery summer dress code. (Tr. 278.)

SIREN RETAIL CORPORATION D/B/A STARBUCKS RESERVE ROASTERY                    9

September 2022, testified that the dress code for partners at the NYC Roastery consists of the following components: 1) Starbucks partner guidebook; 2) Siren Retail Look Book; and 3) Siren Retail addendum. (Tr. 154.) The partner guidebook is a handbook containing rules, standards, and procedures for partners across all of Starbucks' stores. New hires at the NYC Roastery receive a copy of the Starbucks partner guidebook and the Siren Retail Look Book, which outlines appropriate (and inappropriate) attire for Roastery employees. At the same time, new partners at the NYC Roastery receive a copy of the Siren Retail addendum, which sets forth a secondary dress code only for partners working at the Roastery. Partners receive a digital and hard copy of the guidebook, Look Book, and Siren Retail addendum at the beginning of their employment. (Tr. 168–170.)

Paragraph 11 of the parties' joint partial stipulation of facts states that the "Starbucks Reserve Roastery and Tasting Room Retail Addendum to Starbucks Partner Guide—U.S. Store Edition (January 2021), the Partner Dress Code policy, the Dress Code Look Book, and the Summer Dress Code Guidelines are collectively referred to as the "NYC Roastery Dress Code." (Jt. 1, p. 11.)

The introduction to the Starbucks Reserve Roastery and Tasting Room Retail Addendum to Starbucks Partner Guide—U.S. Store Edition (hereinafter Retail Addendum) states the following:

> "This addendum to the *Starbucks Partner Guide- U.S. Store Edition* outlines key employment policies for Starbucks Reserve Roastery and Tasting Room ("Reserve Roastery") retail partners (store managers, shift managers and baristas) that differ from those policies that apply to other Starbucks retail store partners. With the exception of the following outlined in this Addendum, Reserve Roastery retail partners should refer to the policies and guidelines outlined in the *Partner Guide* provided during new partner orientation and available to partners for reference throughout their employment with Starbucks. Refer any questions or concerns to your store manager or contact your Partner Resources generalist." (Joint 1, page 16).

The Retail Addendum then contains the following language under the subject heading "Dress Code and Personal Presentation:"

> "Partners are the face of our brand, connecting with our customers every day. Starbucks Reserve Roastery partners should present a clean, neat and professional appearance when starting every shift. Clothing must be clean, hemmed, wrinkle-free and in good repair.
>
> All partners are expected to follow these standards during the workday. A partner who comes to work inappropriately dressed or with unacceptable appearance may not be permitted to start his or her shift. Failure to adhere to the dress code may result in corrective action, including separation from

employment. Exceptions to the dress code may be made where required by law to accommodate sincerely held religious beliefs or a disability. Please contact your Partner Resources generalist for more information about exceptions." (Joint 1, page 16).

*Dress Code Regarding Shirts, Sweaters, and Jackets*

Respondent's Retail Addendum for the NYC Roastery includes the following dress code provisions concerning shirts:

> "A long or short-sleeved button-down shirt with a collar must be worn. Shirts must be a solid color, simple pattern or print.
>
> Shirts may have a small manufacturer's logo, but must not have other colors, designs, logos or writings…
>
> If a visible undershirt is worn, such as a T-shirt, it does not need to match the shirt color, but should harmonize with it." (Jt. 1, p. 16.)

Respondent's Retail Addendum for the NYC Roastery also includes the following dress code provision concerning sweaters and jackets:

> "In cooler temperatures, a solid dark blue or black jacket, or a solid dark blue, black or gray sweater may be worn over the shirt. Sweatshirts or hooded shirts are not acceptable. Other than a small manufacturer's logo, outerwear must not have logos or writing. Crewneck sweatshirts sold in Starbucks Roastery retail are acceptable over a button down collared shirt." (Jt. 1, p. 17.)

*Four-Page Partner Dress Code Applicable to the NYC Roastery*

The parties also stipulated that a separate partner dress code has been in place at the NYC Roastery since at least August 2022. The dress code introduction explains that:

> "We are coffee and culinary professionals. We need to be comfortable and stylish. It is critical that we get the details right in our dress; that form and function work together.
>
> Our dress code is designer driven. We are hip and trendy. Our partners come from all over the world, bringing with them difference (sic) cultures, styles and languages…" (Jt. 1, p. 23.)

The partner dress code then sets forth guidelines concerning hair and hats, nails, jewelry/piercings, tattoos, personal hygiene, and name tag/apron.[9] The section heading titled "In Closing" summarizes that:

> "You are expected to follow these standards during the workday. If you come to work inappropriately dressed or with unacceptable appearance, you may not be permitted to start your shift. Failure to adhere to the Dress Code may result in

---

[9]  The name tag/apron provision states that "Partners must wear a nametag with your name and include city, state or country where you are from. Partners will receive their own leather Roastery apron and are responsible for its care and safekeeping. Apron should be clean and wrinkle free. Starbucks issued or coffee barista pins securely fastened only." (Jt. 1, p. 23.) This language differs slightly from the Retail Addendum.

which reads: "Names and home city or state or country on aprons are worn during each shift as specified by operational standards. No other modifications should be made to the apron itself unless specifically permitted by Retail Operations guidelines. *Black Lives Matter and World Aids Day are the Starbucks exceptions…" (Jt. 1, p. 16).

corrective action, including separation from employment." (Joint 1, page 23).

Underneath the general partner dress provisions, there are specifically delineated dress requirements for partners working in different locations throughout the Roastery. For baristas and operations leads working at the main bar, experience bar, and in the retail section, the dress code is as follows:

"TOPS:

- Button-down shirt with a collar or turtleneck (short or long-sleeved).
- Color palette: Muted color tones of red, orange, yellow, green, blue, brown, purple, black, brown and white[10]
- Solid colors or a small, simple pattern or print
- Shirts may be worn tucked in or untucked and cannot expose midsection.
- An undershirt, vest, cardigan or sweater may be worn, and does not need to match, but must harmonize with the shirt color
- Siren Roastery Merch Shirts, Sweatshirts or Partner Network shirts are allowed with turtleneck or collared shirt underneath
- All attire must be clean and wrinkle-free…" (Jt. 1, p. 24.)

The barista dress code goes on to describe appropriate attire for "bottoms, accessories, shoes, aprons, and hats" and provides visual aids for the approved color palette and approved hat styles. The dress code then provides the same types of information for partners working at Princi bakery and Arriviamo. (Jt. 1, p. 25.)

An additional component of the NYC Roastery dress code is a "Look Book," which provides a similar, yet slightly different bulleted list of permissible dress for partners working at the main bar, experience bar, and in the retail area:

- "Button-down shirt with a collar (short or long-sleeved) or a turtleneck in a muted solid color, small simple pattern or print. Acceptable colors are: Black, Gray, Navy, Brown, Khaki & White
- **ONLY EXCEPTION TO COLOR PALETTE: Reserve Roastery Retail Clothing items (as long as worn with collared shirt underneath) this includes: T-shirts, sweatshirts, Roastery branded beanies only (NO BASEBALL CAPS)
- Shirts may be worn tucked in or untucked. If worn untucked, the bottom must be long enough not to expose the partner's midsection while working, but generally not longer than the back pants pocket

- An undershirt, cardigan or sweater may be worn, and does not need to match, but must harmonize with the shirt color
- Dark blue denim jeans or solid black jeans with cuffs rolled up. Leather or leather like lace up sneakers, oxfords, or ankle boots in Brown or Black
- Accessories: Fun dress socks, handkerchiefs, ties, bowties. Approved Hat in Black, White, Gray, Brown, Khaki, or Beige" (Jt. 2, P. 7).

The Look Book goes on to provide visual examples of what is approved attire and what is not under the heading of "Do's and Don'ts." The "Don'ts" section additionally confirms that "shirts must be in color palette range" and partners may not wear bright or neon colors and no large or distracting patterns. (Jt. 1, p. 28; Jt. 2, p. 7.)

An additional element of the NYC Roastery dress code is a summer dress code that went into effect in 2020[11]. The written summer dress code says that:

- "only Roastery T-shirts are allowed (no collar needed)
- Shorts colors are khaki, navy, black, dark blue & black denim
- Short length: inseam must be 7" or longer
- Patio: Aprons are allowed to be folded in half with your nametag on the edge." (Joint 2, page 10).

*Testimony Regarding Summer Dress Code and Partner Network T-shirts*

Alex Sariyan testified that during the summer, NYC Roastery partners that work on the outside patio are permitted to wear T-shirts without collared shirts underneath, so long as it is a Starbucks-branded T-shirt. (Tr. 173.) This is consistent with the above-referenced summer dress code, and Sariyan made clear that only Starbucks-branded T-shirts sold in the NYC Roastery are permitted to be worn by partners. (Tr. 172.)[12] Each of these T-shirts has the Starbucks Reserve logo on the sleeve.

Eryn Sable testified that as of 2020, partners have been permitted to wear other Starbucks-branded T-shirts beyond the T-shirts sold in the NYC Roastery. (Tr. 222.) Carlos Carrasco-Rivera then testified that NYC Roastery partners are permitted to wear Starbucks partner-network T-shirts while working either inside the Roastery (with a collared shirt underneath) or on the outside patio (Tr. 296.)[13] Carrasco-Rivera explained that there are about 10–12 Starbucks partner networks that are designed to create community within the company.[14] These networks are for partners who identify as Hispanic, Veterans (or serving in the armed forces), African-American, and Pan-Asian, for example. These are Starbucks partner-run organizations, but partners have

---

[10] Exhibit B of Joint 1 differs slightly from the language cited by the parties in par. 8 (p. 4) of Jt. Exh. 1. Exhibit B added red, orange, yellow, green, blue, and purple to the accepted color palette while omitting references to navy and grey. (Jt. 1, p. 24.) Ashley Kido testified that green and red were added to the color palette at some point, but Kido could not recall when those colors were added. (Tr. 98, 142.)

[11] The Summer Dress Code only applies to the NYC Roastery and does not apply to Respondent's Seattle and Chicago Roasteries (even though the Chicago Roastery has an outdoor patio). (Tr. 230.)

[12] Eryn Sable testified that partners must purchase these T-shirts, albeit with a 30 percent discount. (Tr. 196.)

[13] Ashley Kido testified that during the summer, partners can wear Roastery-approved T-shirts that are available for purchase in the Roastery. (Tr. 98.) Kido was not specifically asked about Starbucks partner-network T-shirts.

[14] These partner networks are open to partners who work in the regular Starbucks stores, the Roasteries, and the Reserve stores across the United States. (Tr. 294.)

SIREN RETAIL CORPORATION D/B/A STARBUCKS RESERVE ROASTERY    11

to apply for membership to these networks through Starbucks' Partner Hub internal web portal. Once they are granted access to the specific partner network, the partners will receive a T-shirt from that organization. (Tr. 292–295.)

The various partner-network T-shirts are similar in design. The shirts are usually black or dark green (but occasionally blue or brown) and feature a small logo in the upper left front side of the shirt that fuses with the specific partner-network's identity, as well as a small message on the back of the shirt. For example, the Hispanic partner-network T-shirt says "Hora del Café," which translates to "Coffee Time." (Tr. 290–293, 298.) These T-shirts are not sold in the NYC Roastery. (Tr. 291.)

*Dress Code Regarding Pins and Buttons*

The parties stipulated that since January 2021, Respondent has maintained and enforced the following dress code concerning pins and buttons at its NYC Roastery:

> "Partners may only wear buttons or pins issued to the partner by Starbucks for special recognition or for advertising a Starbucks-sponsored event or promotion; Starbucks approved pins representing a partner network and one reasonably sized and placed button or pin that identifies a particular labor organization or a partner's support for that organization, except if it interferes with safety or threatens to harm customer relations or otherwise unreasonably interferes with Starbucks public image. Pins must be securely fastened.
> BLM pins are allowed by Starbucks.[15]
> Partners are not permitted to wear buttons or pins that advocate a political, religious or personal issue." (Joint 1, page 2).[16]

*NYC Roastery Partners Wear Union T-shirts on September 19, 2022*

Ashey Kido[17] is an operations lead at the NYC Roastery. Kido arrived for work at about 6:00am[18] on September 19, 2022 wearing a brown turtleneck and black denim pants. Kido changed clothes in the employee locker room and put on a black T-shirt that read "Starbucks Workers United." The T-shirt contained a graphic of a hand grabbing what appears to be a coffee shaker. (Jt. 2, Tr. 100.)



Kido then put on a work apron and clocked in to start the shift. Kido greeted an associate manager named Sally, received a schedule for the day, and performed regular pre-store opening activities—cash management, setting up coffee equipment, and preparing food case displays. (Tr. 100, 146.)

Kido was not alone in wearing the Starbucks Workers United T-shirt ("Union T-shirt") that day. In a coordinated effort, about 5-7 partners that morning wore the black union T-shirts and all of the partners who wore the union T-shirts worked at the main bar. (Tr. 68, 81, 112, 170.)[19]

*Ashley Kido's Testimony*

Kido testified that sometime between 9 a.m. and 10 a.m, Sariyan asked to speak with her and then they walked over and sat down on a couple of stools near the main bar. Sariyan told Kido that the union T-shirt was not compliant with Respondent's dress code. Kido replied that the NLRB as a federal agency permitted employees to wear the union T-shirt. Sariyan said that he didn't know anything about that, but that he would look into the matter. Sariyan asked Kido to remove the shirt and told Kido that if she did not remove the union T-shirt, she would be written up. Sariyan then asked Kido to talk to her co-workers about removing their T-shirts as well. Kido said that she was responsible for her own actions, but she was not responsible for the actions of others and Sariyan would have to ask them himself. Sariyan told Kido she could have 5–10 minutes to change her clothes. (Tr. 101–102, 117.)

Kido then went downstairs to confer with a Union representative. A few minutes later, Kido spoke with Sariyan again, but this time, several other partners who were wearing the union T-shirts joined the conversation. This conversation took place by the main bar, almost in the middle of the Roastery. (Tr. 121.) Kido told Sariyan that she was permitted to wear the union T-shirt at work and handed Sariyan a slip of paper that allegedly confirmed her belief that federal law permitted her to wear the union T-shirt at work.[20] (Tr. 102–103, 120.) Sariyan said that he

---

[15] This language comes from the Retail Addendum submitted as Jt. Exh. 1 (p. 18). The BLM pins language was not part of the amended complaint pleading, but in its posthearing brief (p. 15, fn. 4) Respondent acknowledges that the complaint language referenced an older version of Respondent's dress code and the operative dress code, which references BLM pins, is the one I refer to above.

[16] Partners who work in the Princi bakery are not permitted to wear pins or buttons due to food safety regulations. (Tr. 238.) Counsel for the General Counsel concedes in footnote 4 (p. 4) of her posthearing brief that she is not challenging the Princi bakery restrictions.

[17] Kido testified that she uses she/him pronouns. For clarity of the record here, I am using the "she" pronoun when referring to Kido throughout this decision.

[18] At that time, the NYC Roastery opened to the public at 7 a.m. (Tr. 145.)

[19] There were about 20 partners in all working at the NYC Roastery that day. Only 5 to 7 out of the 20 partners wore the union T-shirts. (Tr. 170.)

[20] Kido testified that she no longer has a copy of this slip of paper and the slip of paper was not offered as an exhibit at the hearing. (Tr. 123.)

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

wasn't going to read the paper or sign it, and again asked her to change out of the union T-shirt. Sariyan said that if she did not change out of the union T-shirt, she would receive a written warning for being out of dress code. Kido asked Sariyan to clarify whether she would still be written up if she changed out of her union T-shirt. Sariyan said that she would not be written up if she changed out of the T-shirt, but Sariyan told her that if she did not change out of the union T-shirt, she would be disrupting Respondent's business and he would write her up. Kido and her co-workers then went to the employee break room, changed out of the union T-shirts, and resumed their shifts. (Tr. 103–104.)

This was the first and only time that Kido wore the union T-shirt while at work. (Tr. 126, 147.) No employee was disciplined for wearing the union T-shirts on September 19th. (Tr. 126.)

*Alex Sariyan's Testimony*

Alex Sariyan testified that on September 19th, he arrived at work sometime between 9 a.m. and 10 a.m., had an off-the-floor meeting at 10 a.m., and emerged from that meeting about 35 minutes later. Sariyan was near the main bar and noticed that several partners that had been in compliance with the dress code earlier that morning were no longer in compliance with the dress code. These partners, about 5 to 7 of them, were wearing the black union T-shirts over their aprons. (Tr. 154–156.)

Sariyan approached Kido and asked where the T-shirts came from. Sariyan does not recall Kido's response, but he told Kido that the union T-shirts were not approved dress code attire and he would give her the option and time to change into approved dress code. Initially, Kido refused, but Sariyan did not recall Kido's explanation for her refusal. (Tr. 157–158.)

Sariyan then stepped off of the floor and called the NYC Roastery's managing director, Sta Stenson, for guidance, as he was unsure how to handle the situation. A few minutes later, Sariyan spoke again with Kido, explained that partners needed to be in approved dress code, and shared that he would slow down operations (meaning letting fewer customers into the Roastery) to allow Kido and the other partners time to change their shirts. Although Kido told Sariyan that the partners had a federal right to wear the union T-shirt at work, Kido and the other partners agreed to change back into approved dress code. Once the partners changed their shirts, Kido handed Sariyan a piece of paper indicating that Respondent was violating their federal rights by refusing to allow them to wear the union T-shirts. (Tr. 158–162–163.)

Sariyan testified that he did not specifically discuss with Kido how she would be held accountable for not being in compliance with Respondent's dress code and said that there was no discussion of potential consequences (e.g. written discipline) for refusing to comply with the dress code. (Tr. 171.)

Sariyan further testified that he observed the partners wearing the union T-shirts over their aprons, or not wearing the aprons at all. Sariyan posited that even if the partners wore the union T-shirts under their aprons, they would still be out of dress code because the only approved T-shirts for partners to wear at the

---

NYC Roastery are the Starbucks-branded shirts sold inside the Roastery. (Tr. 173.)

None of the partners who wore the union T-shirts at work on September 19th was disciplined. The partners in question worked the rest of their shifts that day in compliance with Respondent's dress code. (Tr. 162.)

*Laura Garza's Testimony*

Laura Garza worked as a barista at the NYC Roastery from June 2021 through March 2023. (Tr. 37–38.) On September 19th, Garza came to work at about 10 a.m., went to the locker room, put on the union T-shirt, and donned her apron over the T-shirt. Garza then punched in and assumed her responsibilities at the espresso bar.[21] (Tr. 42–43.)

A short time later, Garza heard assistant manager Alex Lokken say to employees something to the effect of you guys were told not to wear those shirts. Garza testified that she had her back to the conversation, the espresso machines were on, she was concentrating on making drinks for her customers and so she did not hear much of this conversation, nor does she recall to whom Lokken was speaking. (Tr. 43–44, 64, 87.)

About ten minutes later, Garza heard Sariyan telling other partners that they were not allowed to wear the union T-shirts and they needed to go downstairs and change out of the shirts. (Tr. 44.) Garza continued working and a short time later, Sariyan began making drinks alongside her. Sariyan said to her something to the effect of "the shirts are looking brand new or fresh." Garza responded that was how she liked to wear the shirt. Sariyan then told Garza that she could go downstairs and change out of her shirt. Garza followed this instruction and changed out of her union T-shirt. (Tr. 45.)

Garza was not disciplined for wearing the union T-shirt and she is not aware of any employees who were disciplined for wearing the union T-shirt. (Tr. 85–86.)

Sariyan testified that he did not recall speaking with Laura Garza on September 19. (Tr. 162.)

*Videos of the Sariyan/Kido Conversation*

Pursuant to Respondent's trial duces tecum subpoena, the Charging Party produced four video clips showing portions of Alex Sariyan's conversation with Ashley Kido on September 19. The video clips ranged in length from 23 seconds to 1 minute and 39 seconds. I admitted the videos into evidence, over the Charging Party and General Counsel's objections, as Respondent 1 through 4. These videos show portions of the same conversation between Kido and Sariyan and several partners are present for this conversation.[22]

The videos were of generally poor quality with very little audible on the recordings. The following can be gleaned from the recordings, as confirmed through Kido's testimony:

- Kido is the individual wearing the ID lanyard on her waist (Respondent 3);
- Kido is wearing a Union T-shirt, but is not wearing an apron during the conversation with Sariyan

---

[21] There are two espresso bars in the main bar area. This oval shaped workspace also contains a section for drip coffee production as well as the preparation of noncoffee beverages. (Tr. 82.)

[22] It is unclear from the record who made these recordings.

SIREN RETAIL CORPORATION D/B/A STARBUCKS RESERVE ROASTERY 13

- (Respondent 1 and 4; Tr. 132, 138, 141);
- Kido and Sariyan are speaking during the videos (Tr. 138);
- At least two partners seen in the videos are wearing their work aprons (Respondent 4);
- Sariyan identifies someone named "Laura" as a partner who should remove their shirt;
- Kido and another partner are holding the slips of paper referencing their belief that the NLRA allows these employees to wear the Union T-shirts at work (Respondent 2; Tr. 136, 140);
- There was no mention of discipline in the parts of the video that are audible (Tr. 132);
- The videos captured most, but not all of Sariyan's conversation with Kido, and most of what was said during the conversation cannot be discerned.

### Previous Litigation Regarding Pins and Buttons[23]

In 2006, Starbucks and the Board entered into an informal settlement agreement to resolve an unfair labor practice charge filed by the International Workers of the World (IWW) regarding Starbucks' alleged refusal to permit partners to wear pins and buttons in support of the IWW at several New York City neighborhood Starbucks stores.[24] The settlement resulted in Starbucks adopting the following language in the next published version of the Starbucks partner guide:

> "Partners are not permitted to wear buttons or pins that advocate a political, religious or personal issue. The only buttons or pins that will be permitted are those issued to the partner by Starbucks for special recognition or advertising a Starbucks-sponsored event or promotion; and reasonably-sized and – placed buttons or pins that identify a particular labor organization or a partner's support for that organization, except if they interfere with safety or threaten to harm customer relations or otherwise unreasonably interfere with Starbucks public image."

Shortly after entering into the 2006 settlement agreement, Starbucks interpreted its obligations under the Act to require no more than one union pin per partner per shift. IWW filed a charge against the one-pin rule and in 2008, ALJ Mindy Landow found that Starbucks violated Section 8(a)(1) of the Act because Starbucks failed to demonstrate that there were special circumstances warranting the promulgation and enforcement of its one-pin rule. In *Starbucks Coffee Co.,* 355 NLRB 636 (2010), the Board affirmed Judge Landow and found that Starbucks failed to establish special circumstances justifying its one-pin rule and thus, Starbucks' one-pin rule violated Section 8(a)(1) of the Act.

This issue was appealed to the Second Circuit and in *NLRB v. Starbucks Corp.,* 679 F.3d 70 (2nd Cir. 2012), the Second Circuit found that Starbucks' enforcement of its one-pin dress code was not an unfair labor practice. The Court found that Starbucks was entitled to oblige its employees to wear pins/buttons promoting

its products and the information contained on those pins/buttons was just as much a part of Starbucks's public image as any other aspect of its dress code. The Court went on to say that Starbucks was also entitled to avoid the distraction that two or more union buttons would bring, and that Starbucks adequately maintained the opportunity to display pro-union sentiment by permitting one, but only one, union pin/button on workplace clothing. Thus, Starbucks had met its burden of establishing that the one-pin restriction was a necessary and appropriate means of protecting its legitimate managerial interest in displaying a particular public image through the messages contained on employee pins/buttons. Id. at 78.

### Analysis

#### A. Collateral Estoppel Dictates Dismissal of the One Pin Rule Allegation

Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Montana v. United States,* 440 U.S. 147, 154–155 (1979); *Big D Service Co.,* 293 NLRB 322, 323 (1989). An issue is "necessarily determined" if its adjudication was necessary to support the judgment entered in the prior proceeding. *Marlene Industries Corp. v. NLRB,* 712 F.2d 1011, 1015 (6th Cir. 1983). For collateral estoppel to apply, the issue must have been actually litigated in the prior proceeding. *Big D Service Co.,* 293 NLRB at 323; *Parklane Hosiery Co., Inc., v. Shore,* 439 U.S. 322, 326 fn. 5 (1979). In *United States v. Stauffer Chemical Co.,* 464 U.S. 154, 173 (1984), the Supreme Court held that collateral estoppel is applicable against the Government where "mutuality" exists, i.e., "in a case where the Government is litigating the same issue arising under virtually identical facts against the same party "in a second case."

The Board's decision in *Sabine Towing & Transportation Co.,* 263 NLRB 114 (1982) is instructive here. In *Sabine Towing,* the issue presented was whether the employer violated the Act by refusing to permit nonemployee union organizers to board its docked vessels to solicit the employer's employees concerning an upcoming representation election. The Board found a violation in an underlying case (*Sabine I*), and *Sabine I* was appealed to the 5th Circuit Court of Appeals. The Circuit Court denied enforcement of the Board's order, finding that the Board had misallocated the burden of proof, and noting that had the Board allocated the burden properly, it would have found in the employer's favor.

Then a few years later, the employer again denied union organizers access to its docked vessels in the runup to a rerun election. The General Counsel issued a new complaint alleging that the employer's more recent denial of access violated the Act. But ALJ William Schmidt found, and the Board adopted the ALJ's reasoning in full, that collateral estoppel required the dismissal of the more recent denial of access claim. In this regard,

---

[23] An administrative law judge may rely on the factual findings in a prior case under the doctrine of collateral estoppel. See *Great Lakes Chemical Corp.,* 300 NLRB 1024, 1025 fn. 3 (1990); *Planned Building Services, Inc.,* 347 NLRB 670, 670 fn. 2 (2006).

[24] This litigation preceded the opening of the NYC Roastery by over a decade.

14                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Judge Schmidt noted that the litigation in his case involved the same parties, the same group of targeted employees, and similar alleged misconduct as in *Sabine I*, and that the fundamental principles applicable to cases involving nonemployee access had remained unchanged since the Circuit Court's decision in *Sabine I*.

Judge Schmidt noted that:

> "...these parties have once before litigated the question of whether or not these seamen are accessible to outside organizers. It is this question which is always fundamental to the outcome of cases of this nature and which consumes so much time in proceedings of this type. Therefore, the essential question posed by this litigation is whether or not anyone will ever be bound by a judgment previously made which rests on the factual conclusion that these seamen are sufficiently accessible at locations away from Respondent's premises or must this issue be resolved each time a mere request for access is made and it is denied." Id. at 120.

Citing *United States v. Montana,* Judge Schmidt posited that although there was a temporal difference between the actions in *Sabine I* and the case before him, the General Counsel failed to show that there was a material change in the factual circumstances to warrant a redetermination of the central access issue. Id. at 121. Thus, Judge Schmidt concluded that the issue before him was no more than an attempt to relitigate the accessibility question previously determined by the Circuit Court and that the parties were estopped from seeking a reconsideration of the prior determination that the employer's seamen were reasonably accessible away from its premises.

The one-pin rule at issue before me is nearly identical to the one-pin rule decided by the Second Circuit. The only difference is that the current rule, as spelled out in the Retail Addendum, explicitly permits partners to wear Black Lives Matter (BLM) pins and pins representing Starbucks partner networks. But this minor change is factually immaterial to the central issue concerning this specific allegation - whether Respondent's maintenance of a dress code rule limiting its NYC Roastery partners to wearing one pin identifying a particular labor organization violates Section 8(a)(1) of the Act.[25] The answer to that question has already been supplied by the Second Circuit. The General Counsel and Respondent litigated that very question through the Circuit Court and the Circuit Court determined that Respondent's maintenance of its one-pin rule does not violate the Act.

Eleven years later, the General Counsel alleges that the virtually identical rule maintained for NYC Roastery employees should not be subject to issue preclusion. Even though the NYC Roastery did not exist when the one-pin rule was first litigated through the courts, that fact does not change the outcome. In this regard, Respondent's multi-faceted, elaborately written dress code for its NYC Roastery partners contains the same one-pin rule that Starbucks' neighborhood store partners adhere to. And that is the specific rule alleged to violate the Act in paragraph 6 of the amended complaint. Since it is the same prosecuting and responding parties litigating nearly identical facts already

litigated before and determined by the Second Circuit, collateral estoppel principles compel the conclusion that the General Counsel is foreclosed from seeking reconsideration of the one-pin rule and must be bound by the Second Circuit's determination. Therefore, I recommend dismissal of the allegation concerning Respondent's maintenance of its one-pin rule.

### B.  *Jefferson Chemical Does Not Require Dismissal of the Shirts and Tops Dress Code Rule*

Respondent asserts that General Counsel's 2008 litigation before Judge Landow regarding maintenance of its shirts and tops dress code rules forecloses the current litigation under *Jefferson Chemical,* 200 NLRB 992 (1972). The Board has made clear that *Jefferson Chemical's* holding is policy-based, not jurisdictional, and is limited to those narrow circumstances where the General Counsel attempts to "twice litigate the same act or conduct as a violation of different sections of the Act" or "to relitigate the same charges in different cases." *National Association of Broadcast Employees & Technicians,* 371 NLRB No. 150, slip op. at 3 fn. 10 (2022); *Affinity Medical Center,* 364 NLRB 880, 881 (2016). Where the new allegations are factually independent from the allegations that were litigated in the earlier proceeding, it is permissible for the General Counsel to litigate the new allegations separately, since the separate proceedings will not sacrifice fairness and economy. *Affinity Medical Center,* 364 NLRB at 881.

It appears that in the earlier Starbucks cases, the General Counsel pled a portion of Respondent's dress code concerning shirts as a violation of the Act based on an unlawful maintenance theory, and then separately pled disparate enforcement of this rule. But Judge Landow's decision did not specifically address the unlawful maintenance of this dress code provision. Judge Landow did note the following in footnote 34:

> "Although the General Counsel contends in its brief that the stricter enforcement of the dress code is a violation of Section 8(a)(1), the General Counsel has not set forth any theory under which I might find such a violation where the allegation has not been pled in the complaint. In this regard, I note that the General Counsel amended the instant complaint on numerous occasions during the hearing, and at no point put the Respondent on notice that it would argue that the overall enforcement of the dress code at the Union Square East store was violative of the Act. Moreover, the General Counsel failed to develop the record with specific evidence regarding when the dress code began to be more strictly enforced. Upon review of the record I find that, under all the circumstances, the matter was not fully litigated and accordingly, will make no findings with regard thereto."

This footnote focuses on a stricter enforcement theory of a violation as opposed to the unlawful maintenance of a dress code rule. It is unclear from the record just how the General Counsel amended its complaint during the hearing before Judge Landow and what impact those amendments had, if any, on paragraph 18(a) of the complaint that is attached to Respondent's Motion

---

[25] The BLM pin and Starbucks partner pin language will, however, impact my analysis *infra* in Section E of this decision concerning the

allegation prohibiting wearing pins or buttons that advocate for a personal, political, or religious issue.

for Partial Summary Judgment. What I do know is that Judge Landow did not make a finding on the lawfulness of the maintenance of a dress code rule pertaining to shirts. And the Board and Second Circuit decisions that followed are equally silent regarding this allegation. Based on the above, I conclude that *Jefferson Chemical* does not warrant dismissal of the instant complaint allegation regarding shirts and tops. And because there was no finding from the Board or the Second Circuit on this issue, collateral estoppel also does not apply to this specific complaint allegation.

Furthermore, I note that unlike the one-pin rule here, which is nearly identical to the rule previously considered by the Second Circuit, elements of Respondent's NYC Roastery dress code make the shirts and tops rule factually independent from the rule supposedly addressed in Judge Landow's case. To this end, the rule in Judge Landow's case only allowed partners to wear plain black or white shirts with the same color undershirt. In the instant case, the NYC Roastery dress code permits partners to wear shirts with a simple pattern or print, with an expanded color palette that includes orange, purple, red, yellow, brown, and khaki. Importantly, the NYC Roastery dress code sets forth several exceptions to the general rule concerning tops, allowing partners to also wear Siren Retail merchandise shirts as well as partner network shirts. And the NYC Roastery dress code consists of a Look Book with visual examples of what is permissible attire and what is not. Coupled with the fact that the Roastery concept and its very detailed dress code did not exist at the time of Judge Landow's case, these factors further militate against the application of *Jefferson Chemical* here.

### C. Res Judicata and Collateral Estoppel Do Not Require Dismissal of the Shirts and Tops Dress Code Rule Allegation

Under the doctrine of claim preclusion, or res judicata, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Taylor v. Sturgell,* 553 U.S. 880, 892 (2008) quoting *New Hampshire v. Maine,* 532 U.S. 742, 748 (2001). As noted above, Judge Landow did not make a formal finding regarding the maintenance of shirts and tops dress code rules and neither the Board nor the Circuit Court commented on the matter. Therefore, no final judgment regarding this issue has been established and res judicata is not a basis for dismissing the maintenance of dress code rules allegation concerning shirts and tops. Additionally, we are not talking about the same cause of action because, as noted above, there are material differences regarding the shirts and tops dress code language presented to Judge Landow and the shirts and tops dress code language I am

tasked to decide. Based on the above, I reject Respondent's res judicata defense regarding the maintenance of the shirts and tops dress code rule allegation.

Respondent asserts that the Second Circuit's holding in *NLRB v. United Technologies. Corp.,* 706 F.2d 1254 (2nd Cir. 1983) supports a conclusion that res judicata should apply to the shirts and tops rule at issue here. Respondent emphasizes the Court's statement that res judicata applies to issues both actually decided in a previous case as well as issues that could have been raised in the adjudication of that claim. Id. at 1259. But the predicate for the Court's statement above was a "valid, final judgment on the merits" precludes subsequent litigation for the above-stated reasons. Id. Since neither the Board nor the Second Circuit in the earlier Starbucks litigation made a "valid, final judgment on the merits" concerning the shirts and tops rule, res judicata does not apply to the instant matter.[26]

### Summary of Relevant Case Law Re: Union Insignia

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

In *Republic Aviation Corp. v. NLRB,* the Supreme Court affirmed that "the right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of union activity, and the [employer's] curtailment of that right is clearly violative of the Act." 324 U.S. 793, 802–803 & fn. 7 (1945). The Supreme Court went on to say that the Board must balance "the undisputed right of self-organization assumed to employees under the Act and the equally undisputed right of employers to maintain discipline in their establishments." Id. at 797–798. *Republic Aviation* established the Board's longstanding approach to balancing these rights: a presumption that any employer limitation on the display of union insignia is invalid, with the burden on the employer to establish special circumstances to justify its action. *Tesla, Inc.,* 371 NLRB No. 131, slip op. at 6 (2022).[27]

The Board has treated clothes displaying union insignia the same as union insignia that employees attach to their clothing, such as buttons and pins. *Tesla, Inc.,* 371 NLRB No. 131 slip op. at 7; *Great Plains Coca-Cola Bottling Co.,* 311 NLRB 509, 515 (1993). Thus, Section 7's protection of employees' right to display union insignia "extends to prounion T-shirts," and the Board will find that an employer's interference in any way with such a display of union insignia violates the Act unless the

---

[26] In the same vein, although I do not believe that the allegation concerning the prohibition on wearing of buttons or pins that advocate a political, religious, or personal issue should be dismissed on collateral estoppel, res judicata, or *Jefferson Chemical* grounds, it appears that this is not the only Starbucks complaint across the country that alleges this specific allegation as a violation of Section 8(a)(1) of the Act. See e.g. 10-CA-291616, 06-CA-302100, 28-CA-289622, and 32-CA-292897. In some of these complaints, the General Counsel is alleging that the pin rule is facially unlawful. In other complaints, the General Counsel is only pleading the pin language to support a finding of disparate enforcement of this rule. It is unclear why.

[27] In its post-hearing brief, Respondent argues that I should disregard the Board's 2022 *Tesla* decision because the Fifth Circuit recently denied enforcement of that decision. *Tesla, Inc. v. NLRB,* 2023 WL 7528878 (5th Cir. 2023). It is well settled, however, that the Board generally adheres to a "nonacquiescence policy" with respect to appellate court decisions that conflict with Board law. This policy instructs administrative law judges to follow Board precedent, not court of appeals precedent, unless overruled by the United States Supreme Court. See *D.L. Baker, Inc.,* 351 NLRB 515, fn. 42 (2007). Thus, I am compelled to adhere to the Board's *Tesla* decision as binding precedent in this case.

16                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

employer proves special circumstances that outweigh the employees' right to wear the insignia and that its prohibition is narrowly tailored to address those circumstances. *Tesla, Inc.,* 371 NLRB No. 131 slip op. at 7, 17; *Wal-Mart Stores,* 340 NLRB 637, 638 (2003), enfd. in relevant part 400 F.3d 1093 (8th Cir. 2005). The Board has required an employer to establish special circumstances to justify restrictions on employees' right to display union insignia, even if the employer permitted employees to display union insignia in other ways. *Tesla, Inc.,* 371 NLRB No. 131 slip op. at 10; *Caterpillar, Inc.,* 321 NLRB 1178, 1180–1181 & fn. 10 (1996).[28]

Furthermore, employers may lawfully maintain facially neutral, nondiscriminatory dress codes and uniform policies that implicitly limit or restrict the display of union insignia, so long as they are narrowly tailored to serve a particular, legitimate interest that outweighs the adverse effect on employees' Section 7 rights. *Tesla, Inc.,* 371 NLRB No. 131 slip op. at 8 fn 21. But mere employee contact with customers does not, standing alone, justify an employer prohibiting the wearing of union buttons or insignia. *Floridian Hotel of Tampa, Inc.,* 137 NLRB 1484 (1962). And a uniform requirement alone is not a special circumstance justifying a union insignia prohibition. *Long Beach Memorial Medical Center, Inc.,* 366 NLRB No. 66, slip op. at 3 (2018); *P.S.K. Supermarkets,* 349 NLRB 34, 35, (2007). Furthermore, it is irrelevant that an employer permits employees to wear other union insignia that it deems acceptable. *Holladay Park Hospital,* 262 NLRB 278, 279 (1982).

*Summary of Comparable Special Circumstances Cases*

Respondent asserts that the highly cultivated dress code applicable to its NYC Roastery satisfies the special circumstances test set forth in *Tesla* and is analogous to the "wonderland" effect found in *Starwood Hotels & Resorts Worldwide, Inc. d/b/a W San Diego,* 348 NLRB 372 (2006). In *Starwood,* the employer operated a 250-room hotel in downtown San Diego and marketed the W Hotel experience as a "Wonderland" where guests could fulfill their "fantasies and desires" and get "whatever they want whenever they want it." Id. at 372. To this end, the employer commissioned special uniforms for its public-facing employees to achieve a "trendy, distinct, and chic look." Id. As part of that uniform, employees were permitted to wear a small "W" pin on their upper left chest, but the employer's dress code prohibited all other uniform adornments, including sweatbands, scarves worn as belts, and professional association pins.

The employer in *Starwood* also encouraged employees to "express themselves" in a manner consistent with the trendy atmosphere, encouraged employees to interact with guests on a personal level, and required employees to introduce themselves to each guest. In the *Starwood* case, an in-room food delivery server wore a button about four times the size of the "W" pin that said "JUSTICE NOW! JUSTICIA AHORA! H.E.R.E. LOCAL 30" in reference to ongoing collective bargaining negotiations with the employer. The server's supervisor observed him wearing the button and requested that he remove it.

The ALJ and the Board found that the employer established special circumstances permitting the employer to restrict use of the JUSTICE NOW button in public areas of the hotel. In this regard, the Board noted that the union button would have interfered with the employer's use of a particular server uniform (professionally-designed all-black shirt, slacks, and apron) to create a special atmosphere for hotel customers. The Board in *Starwood* distinguished its case from *United Parcel Service,* 312 NLRB 596 (1993) by noting that the pin in *United Parcel Service* was much smaller than the pin in *Starwood* and contained a less controversial message such that it was less likely to interfere with UPS' effort to create a particular public image than the JUSTICE NOW button in *Starwood.* Id. at 373.

In *Nordstrom, Inc.,* 264 NLRB 698 (1982), the Board found that the employer violated Section 8(a)(1) of the Act by instructing one of its department-store salesmen, who was wearing a button identifying him as a union steward, to remove the union button. In so doing, the Board rejected the employer's defense that its need to preserve the high fashion image of its selling floor employees was a special consideration justifying banning the union steward button. Id. at 702. The Board adopted the ALJ's finding that the button in question was not of a size or intrusiveness which unreasonably interfered with the employer's operations when balanced against the recognized right to wear union insignia in the absence of special considerations. Specifically, the ALJ determined that the button in question was small, tasteful, and inconspicuous, and the lack of an intrusive insignia was likely to reduce controversy among clientele and avoid debasement of the fashionable image of the selling floor employees. Id.

In contrast, in *Pathmark Stores, Inc.,* 342 NLRB 378 (2004), the Board found that the employer did not violate Section 8(a)(1) of the Act by prohibiting its meat, seafood, and deli department employees from wearing certain union insignia while working in customer service areas of the employer's grocery stores. In *Pathmark,* the union and employer were engaged in negotiations over a successor collective bargaining agreement when the union learned that the employer was stocking its meat departments with substantial quantities of prepackaged meats. This reduced unit employees' working hours and reduced hiring of new bargaining unit employees. At one point, five bargaining unit employees wore T-shirts and hats to work that said: "Don't Cheat About the Meat!" Although the employer had no policy on uniforms and had permitted employees to wear other union insignia, the employer threatened all five employees with suspension if they did not remove these particular hats and T-shirts before starting work, believing that the slogan on the hats/T-shirts depicted the employer as dishonest and could damage its relationship with its customers – by getting customers to think that the employer was somehow cheating them in connection with its meat products. Id. at 378–379.

The *Pathmark* Board found that the "Don't Cheat About the Meat" slogan was ambiguous, and it was reasonable for the employer to expect that the slogan likely could lead its customers to believe that, aside from the issue of prepackaging, the employer

_____

[28] Employees' presumptive right to display union insignia is not limited to nonworking time or nonwork areas because unlike union

solicitation or distribution, the display of union insignia does not pose a general risk to production. *Tesla, Inc.,* 371 NLRB No. 131 slip op. at 11, fn. 26.

was cheating them in some other way with respect to the meat offered for sale. The Board further held that the employer's failure to substantiate its claim that its customer relationships had actually been threatened was not significant given the Board's finding that the slogan reasonably threatened to create concern among the employer's customers about being cheated, raising the genuine possibility of harm to the customer relationship. For those reasons, the Board found that the employer satisfied its burden of establishing special circumstances to justify its decision to prohibit unit employees from wearing the T-shirts and hats during their working time in the employer's stores. Id. at 379–380.

### D. Respondent Has Not Established Special Circumstances to Justify Restricting Employees' Section 7 Activities, Namely Wearing a T-shirt with the Union's Insignia

Respondent asserts that the exacting detail and extraordinary design elements of the NYC Roastery, coupled with its highly cultivated dress code meant to harmonize and mesh with the appearance of the Roastery itself, support a finding of special circumstances necessary to permit reasonable restrictions on partners' Section 7 rights. I certainly agree with witnesses' assessments of the creativity and genius on display at the NYC Roastery: "just in awe of the grandeur;" "incredible;" "an immersive experience…you are going to smell (coffee), see it, hear it…and taste it…it's all on display;" "the concept is to create the Willy Wonka of coffee." (Tr. 74, 143, 187, 259.) And in *Starwood Hotels,* the Board countenanced restrictions on union insignia in furtherance of a similar-Wonderland effect. But the dress code promulgated in *Starwood* to execute a trendy, distinct, and chic look consisted of only black or charcoal-colored pants, shirt, and apron accompanied by a small silver-colored "W" lapel pin. *Starwood Hotels,* 348 NLRB at 372, 378–379. There were no exceptions to the rule, and when the food service employee in *Starwood* attempted to wear a large button bringing attention to ongoing contract negotiations, the Board said that the employer's restrictions on the buttons constituted special circumstances because the button would interfere with the special atmosphere created for the hotel's customers.

At first glance, it would appear that Respondent's restrictions here should be upheld because its steampunk, hipster chic design aesthetic mirrors the trendy atmosphere countenanced in *Starwood Hotels.* And Eryn Sable's testimony that "partners don't highlight themselves in the experience—they are part of the backdrop…and the dress code makes it so that partners don't stand out," would seem to support Respondent's restrictions on logos and writings on its uniform tops. (Tr. 190–191.) But a closer look reveals that the exceptions carved into Respondent's dress code swallow the original rule, thereby nullifying the force of Respondent's special circumstances argument. To this end, Respondent initially required a color palette of black, gray, navy,

brown, khaki, and white to help partners blend into the background. But in the last few years, that color palette has greatly expanded, allowing partners to wear red, orange, yellow, green, blue, and purple—hardly colors that make it "so that partners don't stand out."

But more importantly, Respondent's dress code exceptions include Starbucks Roastery T-shirts and sweatshirts as well as Partner-Network shirts. These Roastery T-shirts include images that take up an entire shirt (the Starbucks siren T-shirt in GC Exhibit 3c) as well as shirts with writing specifically designed to draw attention to the shirt ("COFFEE COFFEE COFFEE" T-shirt in GC Exh. 5, p. 2). Furthermore, the 10 to 12 Partner-Network T-shirts that are compliant with the dress code all specifically promote cultural pride (e.g. Hora del Café T-shirts for Hispanic associates) or identification with organizations well beyond the four walls of the Roastery (e.g. military or veteran status). These Partner-Network T-shirts seemingly contradict the stated purpose of the Roastery dress code as they draw customer's eyes to causes that the partner identifies with and in effect makes the partner "stand out." While support for such organizations is admirable, these T-shirts undercut Respondent's argument that its dress code is designed with a neutral, muted palette to allow partners to blend into the background pursuant to its exacting design aesthetic. And it begs the question why Partner-network organization T-shirts promoting African-American culture and veterans status are permitted, but union T-shirts are not? The union T-shirts meet the expanded color palette's requirements—black, with green and white accents—they reference Starbucks, and contain an image of a coffee cup or a coffee shaker. There is no derogatory or incendiary language on the shirt and the graphic is certainly smaller than the gray Starbucks Siren T-shirt in GC Exhibit 3c.[29] And Respondent already allows its NYC Roastery employees to wear one reasonably sized pin or button on their aprons that shows support for a labor organization.[30] Plus, there was no evidence of customer complaints about the union T-shirts or evidence that anybody noticed the union T-shirts except the managers who directed partners to remove the shirts. In sum, Respondent wants its partners adorned in muted colors with nothing to blend into the background of its Willy Wonka-esque design aesthetic but has created a laundry list of exceptions such that its partners may wear shirts/tops adorned with a panoply of Starbucks-endorsed causes, images, and designs specifically conceived to draw attention to the partner and their attire. Thus, the exclusion of Union T-shirts from Respondent's dress code exceptions is neither narrowly tailored to serve a particular, legitimate interest nor does this exclusion outweigh the adverse impact on employees' Section 7 rights. Based on the above, I find that Respondent has failed to establish special circumstances here and its restriction on the display of union insignia, namely union T-shirts, in its NYC Roastery dress code violates Section 8(a)(1) of the Act.

---

[29] Sariyan testified that partners who wore the union T-shirts under their aprons would still be out of compliance with the dress code, even if the Union logo was not visible under the apron. (Tr. 172.) It is unclear why that is.

[30] Even though Respondent permitted its partners to wear one pin showing support for a labor organization, Respondent's tolerance for the display of some union insignia by its employees does not permit it to

restrict other protected displays of union insignia. In *Tesla,* the Board noted that to hold otherwise would effectively treat the display of union insignia as a privilege to be granted by the employer on the terms it chooses rather than as an essential Section 7 right that the employer is required to accommodate. *Tesla, Inc.,* 371 NLRB No. 131 slip op. at p. 12.

18                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

*E. Respondent Violated Section 8(a)(1) of the Act by Maintaining a Rule Prohibiting Partners from Wearing Buttons or Pins That Advocate for a Political, Religious or Personal Issue*

Respondent's dress code explicitly permits partners to wear BLM pins and Starbucks partner-network pins, but the dress code does not permit partners to wear buttons or pins that advocate a political, religious or personal issue. Such an overly broad restriction would leave a reasonable employee with the understanding that wearing pins and buttons that support movements such as "Fight for $15" is forbidden. Thus, this restriction unnecessarily infringes on employees' Section 7 rights in violation of Section 8(a)(1) of the Act.

As a threshold matter, I note that Counsel for the General Counsel did not present any specific evidence at the hearing regarding this allegation. But Counsel for the General Counsel did briefly address this issue in her opening statement "…Finally, the code unlawfully prohibits pins that advocate political or personal issues, which is unlawful under *Stericycle*, 372 NLRB No. 113…" (Tr. 15, lines 4–6.) And this specific language was specifically pled as a violation in paragraph 6 of the amended complaint. Thus, the omission of any reference to this specific theory of a violation in Respondent's post-hearing brief does not implicate any due process concerns.

In her posthearing brief, Counsel for the General Counsel analyzed the legality of this allegation under *Stericycle*, 372 NLRB No. 113 (2023). I, however, believe that Tesla provides the appropriate line of analysis. In Stericyle, the Board announced a revised framework for analyzing facial challenges to work rules under Section 8(a)(1). The Board requires the General Counsel to prove that a challenged rule has a reasonable tendency to chill employees from exercising their Section 7 rights and will interpret the rule from the perspective of an employee who is subject to the rule and economically dependent on the employer, and who also contemplates engaging in protected concerted activity. If the General Counsel carries her burden, the rule is presumptively unlawful, but the employer may rebut that presumption by proving that the rule advances a legitimate and substantial business interest and that the employer is unable to advance that interest with a more narrowly tailored rule. If the employer proves its defense, then the work rule will be found lawful to maintain. Stericyle, 372 NLRB at slip op. 3. The Board clarified that this standard applies only to facial challenges to the maintenance of work rules that do not expressly apply to employees' protected concerted activity. Id. at fn. 3. But the Board specifically stated that its Stericyle decision does not disturb the Board's long-established doctrines covering work rules that address union (or other protected) insignia. Id. at slip op. at 4. Since Respondent's restriction on wearing personal, religious, or political advocacy messages relates only to pins and buttons, the Tesla standard is the appropriate way to analyze the legality of this rule.

The first question is whether Respondent's restriction is narrowly tailored to serve a particular, legitimate interest that outweighs the adverse effect on employees' Section 7 rights. The answer is no. Respondent has provided no explanation for permitting BLM and Starbucks partner-network pins and buttons, which appear to fall under the personal (and perhaps political) advocacy category, yet excludes all other personal, religious, or political advocacy. Thus, this rule signals to partners engaged in

protected, concerted advocacy, such as wearing "Fight for $15" buttons, or other concerted complaints about working conditions, that such activities are prohibited. See In-N-Out Burger, 365 NLRB No. 39 (2017) (Fight for $15 buttons); *Medco Health Solutions, Inc.,* 364 NLRB 1687 (2016) (T-shirts complaining about employer's non-monetary incentive program).

The second question is whether Respondent has established special circumstances to justify its restriction on employees' Section 7 activity. Again, the answer is no. In this regard, Respondent's desire for its partners to appear on stage, yet take a backseat to the wonder and grandeur of the NYC Roastery cannot be married with its granting of permission for partners to wear buttons in support of Black Lives Matter, adorn their aprons with World AIDS Day messages, and wear T-shirts, pins, and buttons that promote the dozen or so Starbucks-partner networks. Thus, Respondent's defenses fail as a reasonable employee would read Respondent's pins and button restrictions to adversely impact their Section 7 rights without narrowly tailoring these restrictions to serve Respondent's legitimate interests. Based on the above, Respondent's restriction on partners wearing pins or buttons that express personal, religious, or political advocacy violates Section 8(a)(1) of the Act.

*F. Respondent Violated Section 8(a)(1) of the Act by Instructing Operations Leads and Main Bar Baristas to Remove Their Union T-shirts*

It is undisputed that on September 19, 2022, Alex Sariyan informed about a half dozen main bar baristas and operations leads to remove the union T-shirts that they were wearing because they were not in compliance with Respondent's dress code. This instruction violated the Act. To this end, the fact that Respondent's dress code did not explicitly restrict union insignia does not insulate Respondent from liability under the Act. See *Boch Imports, Inc. v. NLRB,* 826 F.3d 558, 574–575 (1st Cir. 2016) (rejecting an employer's argument that it neither promulgated its dress ban in response to union activity nor enforced it in a discriminatory manner because 'while the presence of these circumstances may constitute grounds for invalidating a dress ban, it does not necessarily follow that the absence of these circumstances constitutes a ground for upholding a dress ban.'); See also *Tesla, Inc.,* 371 NLRB at slip op. page 12 (That an employer's uniform policy or dress code effectively prohibits employees from wearing all clothing other than the clothing prescribed by the employer [including, but not limited to, union clothing] does not make the employer's action lawful, any more than an employer's no-solicitation rule is lawful because it bars all solicitation [not just union solicitation] on nonworking time). Having found that Respondent has failed to establish special circumstances justifying its restriction on employees' Section 7 activities, Respondent's directive to employees to remove their union T-shirts violates Section 8(a)(1) of the Act. See Id. (employer violated the Act by telling production workers that their black union shirts violated its team wear policy allowing only plain black shirts); *Northeast Industrial Service Co.,* 320 NLRB 977, 978–979 and fn. 1 (1996) (employer violated the Act when it informed crew members that they must remove union stickers from their safety helmets); *Domsey Trading Corp.,* 310 NLRB 777, 806–807 (1993) (supervisor unlawfully directed line worker to

SIREN RETAIL CORPORATION D/B/A STARBUCKS RESERVE ROASTERY

19

*G. Respondent Violated Section 8(a)(1) of the Act When Alex Sariyan Informed Ashley Kido That She Would Be Disciplined if She Refused to Change Out of Her Union T-shirt*

Although in general, I found both Alex Sariyan and Ashley Kido to be credible witnesses, I specifically credit Kido's testimony over Sariyan's regarding the threat to write her up if she failed to change out of the union T-shirt. In this regard, Kido testified on direct examination that in both conversations with Sariyan on September 19, he threatened to issue her a written warning if she refused to change out of her union T-shirt. Kido testified calmly and confidently and was not spoon fed this answer by counsel. And on cross-examination, Kido reiterated that Sariyan threatened her with a written warning if she didn't take off the union T-shirt. (Tr. 119). Kido forthrightly answered Respondent counsel's questions on cross by acknowledging that she knew she was not in compliance with the dress code when she wore the union T-shirt and admitting that Sariyan's warning was not audible on the recordings. But the latter point is not harmful to Kido's credibility because very little is audible on the recordings.

Although Kido testified before Sariyan, Respondent counsel did not specifically ask Sariyan on direct examination whether he had told Kido she would be written up if she refused to change out of the union T-shirt. (Tr. 158–162.) This omission seems purposeful considering there was a specific complaint allegation referencing this alleged unlawful act and Kido testified that Sariyan told her this on two separate occasions. When I asked Sariyan whether he discussed with Kido how she would be held accountable for not being in dress code or whether there was a discussion with Kido as to any potential consequences for her actions, Sariyan answered that no such discussion took place. (Tr. 171.) Thus, I am crediting Kido's direct, detailed testimony that Sariyan twice threatened her with discipline over Sariyan's blanket denial. Based on the above, I find that Sariyan's threats of discipline on September 19th violate Section 8(a)(1) of the Act. See *Northeast Industrial Services Co.,* 320 NLRB at 320 fn. 1; *Ohio Masonic Home,* 205 NLRB 357, 357 (1973), enfd. mem 511 F.2d 527 (6th Cir. 1975).

CONCLUSIONS OF LAW

1. The Respondent, Siren Retail Corp. d/b/a Starbucks Reserve Roastery is an employer within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Charging Party, Workers United, Affiliated with Service Employees International Union, is a labor organization within the meaning of Section 2(5) of the Act.

3. By engaging in the following acts and conduct, Respondent has violated Section 8(a)(1) of the Act:

(a) Maintaining a dress code rule prohibiting employees from wearing shirts or tops that have logos, writings, or designs;

(b) Maintaining a dress code rule prohibiting employees from wearing pins or buttons that advocate a political, religious, or personal issue;

(c) Informing employees that they must remove Union T-shirts worn during their work shifts;

(d) Threatening employees with discipline if they refuse to

remove Union T-shirts worn during their work shifts.

4. All other allegations of the complaint are dismissed.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. Having found that Respondent has unlawfully maintained dress code rules in its NYC Roastery dress code regarding prohibiting employees from wearing shirts or tops that have logos, writings, or designs, and prohibiting employees from wearing pins or buttons that advocate a political, religious, or personal issue, I shall order that Respondent rescind those rules only at its NYC Roastery.

In its post-hearing brief, Counsel for the General Counsel renews its request that this remedy be applied to all three Starbucks Reserve Roastery stores in the United States as well as the three Starbucks Reserve stores in the United States. I decline to grant this request. To this end, the pleadings in this case only specifically referred to the Starbucks Reserve Roastery store in New York City and the parties' joint partial stipulation of facts specifically referred only to the New York City Roastery. See Joint 1, paragraphs 6 through 10. To the extent that the above-announced unlawful dress code provisions also apply to the Chicago and Seattle Roasteries, as well as the three Reserve stores, there is insufficient evidence in this record to draw this conclusion. In particular, the record evidence reflected that only the NYC Roastery contained a summer dress code, and there were certain variations in the dress code (e.g. cuffs, color palette). Thus, extending the remedy announced in this decision to the other five Roastery and Reserve stores in the United States would not be appropriate.

Having also found that Respondent unlawfully told employees that they must remove or change out of their union T-shirts, and that Respondent threatened to discipline employees if they refused to remove or change out of their union T-shirts, I shall order Respondent to cease and desist from instructing employees to remove their union T-shirts, and from threatening to discipline employees if they refuse to remove their union T-shirts during their work shifts.

ORDER

Respondent, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining and enforcing an overly broad shirts and tops dress code rule in its NYC Roastery that prohibits partners from wearing union T-shirts.

(b) Maintaining an overly broad dress code rule in its NYC Roastery dress code that prohibits partners from wearing pins and buttons that advocate a political, religious, or personal issue.

(c) Telling our employees to remove or change out of union T-shirts.

(d) Threatening to discipline employees for wearing union T-shirts during their work shifts.

(e) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to

20           DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

effectuate the policies of the Act.

(a)  Rescind the shirts and tops rule in its NYC Roastery dress code or revise the NYC Roastery dress code to make clear that it does not prohibit partners from wearing union T-shirts.

(b)  Rescind the rule prohibiting buttons or pins that advocate a political, religious, or personal issue in its NYC Roastery dress code or revise the NYC Roastery dress code to make clear that it does not prohibit partners from wearing pins and buttons that advocate for protected, concerted activities relevant to partners' terms and conditions of employment.

(c)  Notify all current employees of the NYC Roastery that the shirts and tops dress code rule in the NYC Roastery dress code has been rescinded, or if it has been revised, provide them with a copy of the NYC Roastery dress code with the revised shirts and tops rule.

(d)  Notify all current employees of the NYC Roastery that the rule prohibiting the wearing of buttons or pins that advocate a political, religious, or personal issue has been rescinded, or if it has been revised, provide them with a copy of the NYC Roastery dress code with the revised pins and buttons rule.

(e)  Post at its New York City Roastery facility copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 2, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email and/or posting on Respondent's Partner Hub intranet, in the same manner that the NYC Roastery dress code is disseminated to partners at the NYC Roastery. The Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 19, 2022.

(f)  Within 21 days after service by the Region, file with the Regional Director for Region 2 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. December 6, 2023

APPENDIX

NOTICE TO EMPLOYEES<br>POSTED BY ORDER OF THE<br>NATIONAL LABOR RELATIONS BOARD<br>An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT interfere with, restrain, or coerce you in the exercise of the above rights.

WE WILL NOT maintain overly broad shirts and tops dress code rules that prohibit our New York City Roastery partners from wearing union T-shirts.

WE WILL NOT maintain overly broad dress code rules that prohibit our New York City Roastery partners from wearing pins and buttons that advocate for political, religious, or personal issues.

WE WILL NOT tell our New York City Roastery partners to remove or change out of union T-shirts.

WE WILL NOT threaten employees with disciplinary action for wearing union T-shirts during their work shifts.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of your rights guaranteed by Section 7 of the Act.

WE WILL rescind our overly broad shirts and tops dress code rules, or revise the dress code rules, to make clear that our dress code does not prohibit our New York City Roastery partners from wearing union T-shirts.

WE WILL rescind our overly broad pins and buttons rule, or revise the pins and buttons rule, to make clear that our dress code does not prohibit our New York City Roastery partners from wearing pins and buttons that advocate for protected, concerted activities relating to our partners' terms and conditions of employment.

WE WILL notify you that our overly broad shirts and tops and pins and buttons dress code rules have been rescinded, or if they have been revised, provide you with a copy of the revised shirts and tops and pins and buttons dress code rules.

SIREN RETAIL CORP. D/B/A STARBUCKS RESERVE ROASTERY

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/02-CA-305984 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.

